HUNTER, Appellant,

v.

BPS GUARD SERVICES, INC., d.b.a. Burns International
Security Services et al., Appellees.

[Cite as *Hunter v. BPS Guard Services, Inc.* (1995), 100 Ohio App.3d 532.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 94APE05–771.

Decided Jan. 31, 1995.

*Blumenstiel, Huhn, Wood & Adams, J.B. Blumenstiel* and *C. Richard Grieser,* for appellant.

*Porter, Wright, Morris & Arthur* and *Thomas A. Young,* for appellee BPS Guard Services, Inc., d.b.a. Burns International Security Services.

*Crabbe, Brown, Jones, Potts & Schmidt, Luis M. Alcalde* and *Francesca M. Tosi,* for appellee Gary J. Sephel, d.b.a. Certified Burglar Alarm Systems.

*Ulmer & Berne* and *Edwin J. Hollern,* for appellee Guardian Security Systems, Inc.

*C. Thomas Leighton,* for appellee Brookshire Cardinal Supermarkets, Inc., d.b.a. Ken's Cardinal Food Store.

BOWMAN, Judge.

On January 31, 1992, plaintiff-appellant, Shawna L. Baker, was working as a cashier at Brookshire Cardinal Supermarket, Inc., d.b.a. Ken's Cardinal Food Store ("Ken's Cardinal" or "the store"), when she was severely injured by a

shotgun blast during a robbery. Appellant filed this action against BPS Guard Services, Inc., d.b.a. Burns International Security Services ("Burns"), the company which had previously provided security guard service to the store; Gary Sephel, d.b.a. Certified Burglar Alarm Systems ("Certified"), the installer of the alarm system at the store; Guardian Security Systems, Inc. ("Guardian"), the alarm monitoring company; and Ken's Cardinal. Ken's Cardinal confessed judgment in the amount of $1,250,000 and a judgment in favor of appellant in the amount of $1,250,000 was entered against Ken's Cardinal. Burns, Certified and Guardian each moved for summary judgment. The trial court granted Burns's and Guardian's motions [1] and appellant is appealing those judgments raising the following assignments of error:

"With respect to summary judgment in favor of defendant, BPS Guard Services, Inc., dba Burns International Security Services:

"1. The trial court erred in granting summary judgment for said defendant.

"2. The trial court erred in holding as a matter of law that the obligations of said defendant to provide guard service at the store of plaintiff's employer under a written contract with the employer were extinguished and that the written contract was abandoned.

"3. The trial court erred in holding as a matter of law that the said written contract was replaced by an oral arrangement between plaintiff's employer and one Robert Thomas to provide guard service as an individual when such activity was in violation of and prohibited by Ohio Rev.Code §§ 4749.01 et seq. and said violation was a criminal offense.

"4. The trial court erred in so holding and ignoring the undisputed evidence that said defendant authorized its agent Thomas to perform such prohibited and unlawful activity and thereby said defendant also committed a violation of law and said violation was a criminal offense.

"5. The trial court erred in so holding and ignoring the evidence of fraud in the inducement in the alleged oral arrangement between plaintiff's employer and Robert Thomas.

"6. The trial court erred in holding as a matter of law that the agreement between said defendant and plaintiff's employer purporting to relieve said defendant from liability and to require the employer to indemnify said defendant's liability was valid and enforceable against the plaintiff.

---

1. Certified's motion for summary judgment is still pending in the trial court.

"7. The trial court erred in holding as a matter of law that no issues of liability of said defendant to plaintiff for breach of contract, negligence and interference with contract were presented for the jury."

Appellant has also raised the following assignments of error:

"With respect to summary judgment in favor of defendant, Guardian Security Systems, Inc.:

"1. The trial court erred in granting summary judgment for said defendant.

"2. The trial court erred in granting defendant's motion for summary judgment holding that the '$250' limitation of liability clause in the contract between defendant and plaintiff's employer was reasonable, valid and enforceable against plaintiff.

"3. The trial court erred in granting motion for summary judgment on the issues of breach of contract and negligence.

"4. The trial court erred in granting defendant's motion for summary judgment and dismissing plaintiff's complaint in failing to address the issue of breach of contract.

"5. The trial court erred in holding as a matter of law that defendant, Guardian Security Systems, Inc., and defendant, Gary J. Sephel, dba Certified Burglar Alarm Systems, were not engaged in a joint venture."

## THE BURNS ISSUES [2]

Because of a number of robberies that had occurred at the store, Kenneth Adkinson, President and sole shareholder of Brookshire, which owns and operates Ken's Cardinal, decided to hire security guards to work at the store. To that end, on December 17, 1991, Adkinson entered into a written contract with Burns in which Burns was to provide uniformed, unarmed security guard service at the store. The contract was titled "Temporary Service Authorization" and was signed by both Adkinson and Robert W. Thomas, Jr., a Burns client-service manager. Dennis Armstrong, another Burns' employee, and Thomas were the security guards who would be providing guard service at the store beginning December 17, 1991.

---

2. This court notes that appellant initially filed a motion for leave to file a long brief which was denied. Apparently, in order to circumvent this court's ruling, appellant filed two briefs: one concerning Burns and one concerning Guardian. This court does not condone this action; however, in the absence of a motion to strike by either appellee, this court declines to do so *sua sponte* this time.

After a robbery at the store on December 21, 1991, in which Thomas was disarmed by a robber,[3] Thomas contacted Gilbert S. Wyche, District Manager of Burns's Columbus office, to discuss the security at Ken's Cardinal. Because it was Thomas's opinion that having a uniformed Burns security guard at the store would not deter armed robberies, Wyche directed Thomas to contact Adkinson to terminate the Temporary Service Authorization.

On December 27, 1991, Thomas held a meeting with Adkinson to discuss the Temporary Service Authorization. The result of the meeting was that Burns would no longer provide guard service at the store and, instead, Thomas and Armstrong, as independent contractors, would provide armed security guard service in their police uniforms.[4] Although there was nothing in writing changing, terminating or modifying the Temporary Service Agreement entered into between Burns and Adkinson, Burns's last day of providing guard service to the store was December 27, 1991, and Burns did not bill Adkinson or Brookshire for service after that date. Beginning on December 28, 1991, when Thomas and Armstrong worked at the store, they punched time cards at the store and were paid directly by Ken's Cardinal. Both Thomas and Armstrong continued to also work and be employed by Burns.

On January 31, 1992, Thomas, dressed in a suit,[5] was on duty at the store armed with a .380 automatic weapon when a robbery occurred. Before the robbery, the two robbers, Jerri Jones and Shantella Ferguson, were told by Mark Strickland to go into the store to look for a security guard. After going up and down all of the aisles and not seeing a security guard, Jones and Ferguson left the store and informed Strickland that they did not see a guard, so he told them to go back in and rob the store. During the robbery, Jones pulled out a shotgun and shouted in a very loud voice for everyone to get on the ground. As appellant was getting the money out of her register, she was shot by Jones. During the

---

3. Under the terms of the Temporary Service Authorization, Burns was to provide unarmed, uniformed guards at the store. Thomas's being armed while on duty at the store on December 21, 1991, was a violation of Burns rules and regulations.

4. Thomas was a commissioned officer in the Fairfield County Sheriff's Department and Armstrong was a commissioned officer in the Shawnee Police Department. Burns did not prohibit its employees from having another security guard position outside of their employment with Burns.

5. On January 17, 1992, while on duty at the store, Thomas was ordered by members of the Franklin County Sheriff's department to remove his Fairfield County Sheriff's uniform and his weapon because Thomas did not have authority to wear a Fairfield County uniform while working in Franklin County. Thomas claimed to have received prior authorization from the Franklin County Sheriff's Department to wear his uniform; however, the Franklin County Sheriff's Department notified Adkinson that Thomas did not have such authorization or clearance.

robbery, Thomas was not near the registers but was by the bread section where his attention had been diverted by two men. Thomas did not hear Jones's command for the customers to get on the floor, nor did he see store customers on the floor. It was as he was observing the two men that Thomas heard the gunshot.

Around 7:00 p.m., and just prior to the robbery, Belinda Kay Cofer, a Burns area manager who frequently visited Thomas at Ken's Cardinal to deliver messages concerning Burns business, arrived at the store to deliver a message to Thomas about a Burns job at Red Lobster. After receiving the messages delivered by Cofer, Thomas was to arrange for a Burns employee to be assigned to the jobs detailed on the messages, or to arrange for replacements for Burns employees who could not work. Thomas was Cofer's immediate supervisor at Burns and Cofer made deliveries of notes to Thomas virtually every evening that he worked at the store. Thomas would usually take care of the business related to these notes by using the telephone in the store office or back by the meat counter. When Cofer was not delivering notes concerning Burns business, she would often come to Ken's Cardinal to chat with Thomas and drink coffee. At the time the gunshot was fired, Cofer was talking to another Burns employee, Becky Sloan, who was also in the store. After the robbery occurred, Cofer rendered medical aid to appellant which assisted in saving appellant's life.

Appellant filed a complaint against Burns asserting that Burns breach of the Temporary Service Authorization contract proximately caused her injuries. Burns answered the complaint and filed a motion for summary judgment to which appellant responded. After an oral hearing, the trial court sustained Burns motion finding that, although appellant was an intended third-party beneficiary of the Temporary Service Authorization contract, Burns and Ken's Cardinal abandoned the written contract and, therefore, appellant could not recover under the contract. In addition, since there was no contract in effect at the time of appellant's injury, Burns owed her no duty and, thus, her claim for negligence was denied. Further, there was no evidence that Burns interfered with the performance of any contract whether it was between Burns and Ken's Cardinal or Ken's Cardinal and Thomas. Finally, the court found that appellant's claims, based on violation of Ohio statute, must also be denied. Judgment to this effect was entered on May 4, 1994, with the additional finding that there was no just reason for delay.

Appellant's first five assignments of error are related and will be considered together. These assignments of error all relate to the issue of whether or not the Temporary Service Authorization was in effect at the time of the robbery. Because appellant asserts that it was, appellant contends that the trial court erred in granting summary judgment for Burns and by holding as a matter of law

that Burns's obligations to provide security guard service at the store under a written contract with Ken's Cardinal were extinguished and that the written contract was abandoned.

 Pursuant to Civ.R. 56, summary judgment is proper if there are no genuine issues of fact and the moving party is entitled to judgment as a matter of law. It is a procedural device designed to terminate litigation at an early stage where a resolution of factual disputes is unnecessary. However, it must be awarded with caution, resolving all doubts and construing the evidence against the moving party, and granted only when it appears from the evidentiary material that reasonable minds can reach only an adverse conclusion as to the party opposing the motion. See *Norris v. Ohio Std. Oil Co.* (1982), 70 Ohio St.2d 1, 24 O.O.3d 1, 433 N.E.2d 615; *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 8 O.O.3d 73, 375 N.E.2d 46. A motion for summary judgment is only appropriate where, after construing the evidence most strongly in favor of the party opposing the motion, reasonable minds could only conclude that the movant is entitled to judgment. *Whiteleather v. Yosowitz* (1983), 10 Ohio App.3d 272, 10 OBR 386, 461 N.E.2d 1331. The burden of establishing that material facts are not in dispute and that no genuine issue of material fact exists is on the party moving for summary judgment. When a motion for summary judgment is made and supported as provided for in Civ.R. 56, an adverse party may not rest upon the allegations or denials of his pleadings, but must produce evidence on issues for which that party bears the burden of production at trial. *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095.

 Parties who have entered into a contract may, by mutual consent or conduct, abandon the contract which they have entered into. In *Hodges v. Ettinger* (1934), 127 Ohio St. 460, 463, 189 N.E. 113, 114, the court defined abandonment as "the intentional relinquishment of a known right." The court stated that a contract will be treated as abandoned when the acts of one party, which are inconsistent with the existence of the contract, are acquiesced in by the other party. Accordingly, mutual abandonment of a contract need not be express, but can be inferred from the conduct of the parties and the surrounding circumstances. *Dickson v. Wolin* (1934), 18 Ohio Law Abs. 107. See, also, *Bryant v. Richfield Properties* (Sept. 5, 1990), Summit App. No. 14533, unreported, 1990 WL 129237. Where one party effectively abandons a contract, the other party may accede to the abandonment and, in effect, the contract is dissolved by the mutual assent of both parties. In such a case, the parties are restored to their original positions and neither party may sue for breach of the contract, nor compel specific performance. See *Hodges* and *Bryant*.

■ In this case, Thomas met with Adkinson on December 27, 1991, to discuss the Temporary Service Agreement. Although what was said during the meeting is in dispute, the outcome of the meeting was very clear. After December 27, 1991, Burns did not send its uniformed security guards to work at the store and it ceased billing Ken's Cardinal for security services. Beginning December 28, 1991, Ken's Cardinal hired its own security guards, whom they paid directly. Simply because the guards working at the store remained the same does not mean that the Temporary Service Agreement remained in effect. Although there was nothing in writing changing, terminating or modifying the Temporary Service Agreement, the parties' actions demonstrate an abandonment of the Temporary Service Agreement by their mutual assent.

■ The circumstances surrounding the Temporary Service Agreement may also be considered a novation. "A novation occurs where 'the principal contractors enter into a new agreement, covering the subject matter of the former contract.' *Bank One, Columbus, N.A. v. Girardi's Restaurant & Bar* (Mar. 3, 1994), Franklin App. No. 93AP–1024, unreported, [1994 WL 67719] citing *Ridenour v. Haynes* (App.1931), 11 Ohio Law Abs. 131." *Bellefontaine Dev. Co. v. Wallick Assoc.* (Jan. 24, 1995), Franklin App. No. 94APE06–957, unreported, 1995 WL 41614. In *Bacon v. Daniels* (1881), 37 Ohio St. 279, the court held at paragraph two of the syllabus:

"An agreement between the parties to a contract and a third person, whereby one party is released from the obligations of the contract, and the third person substituted in his stead, is a *novation*, and requires no further consideration than such release and substitution." (Emphasis *sic.*)

The effect of a novation is to discharge the obligations of the parties under the original contract. *Union Cent. Life Ins. Co. v. Hoyer* (1902), 66 Ohio St. 344, 64 N.E. 435.

In this case, when Thomas and Armstrong were substituted for Burns as the parties to provide security guards for Ken's Cardinal, and Adkinson agreed to this substitution, a novation occurred. At that point, Burns was released from its obligation to provide security guards for the store and all of Burns's obligations under the Temporary Service Agreement were discharged. There is no question that, after his meeting with Thomas, Adkinson agreed that Thomas and Armstrong would supply the security for the store, as opposed to Burns. As such, Burns had no obligation whatsoever to Ken's Cardinal after December 27, 1991.

Appellant also asserts that, because she was a third-party beneficiary to the Temporary Service Agreement, Adkinson and Burns (via Thomas) could not rescind the Temporary Service Agreement without her consent.

■ The original parties to a contract retain the right to terminate a contract without the consent of a third-party beneficiary unless the third-party beneficiary to the contract materially changes her position in justifiable reliance on the contract, brings suit on the contract or manifests assent to the contract at the request of one of the contracting parties. The third-party beneficiary has the burden of proving that the parties should have obtained his consent prior to terminating the contract. *Community Discount & Mtge. Co. v. Joseph* (1927), 117 Ohio St. 127, 157 N.E. 380.

■ In this case, appellant asserts that her mother, Linda Campbell, relied on the presence of the security guards in order to permit appellant to continue to work at the store. Apparently, after the December 21, 1991 robbery, Campbell spoke with Adkinson about appellant's working conditions and about the fact that appellant should not be required to work after 6:00 p.m., because of the potential harm that might result from the robberies that had occurred at the store. Campbell was pleased to learn that Adkinson was going to have security guards at the store, although it does not appear that their presence, let alone the specificity that they be Burns security guards, was a condition for her to permit appellant to continue to work at the store. Appellant was present when Campbell and Adkinson held the discussion concerning her employment and she stated that her employment was not dependent on there being security guards at the store.

None of the above evidence proves that appellant changed her position in justifiable reliance on the Temporary Service Agreement between Burns and Adkinson. In addition, it does not show that appellant manifested an assent to the contract at the request of Burns, Thomas or Adkinson. As such, there was no evidence that appellant or Campbell relied on the presence of Burns security guards at the store when Campbell and Adkinson discussed conditions of appellant's employment.

■ Appellant next asserts that, because Thomas was not licensed under R.C. Chapter 4749 to provide security guard services as an independent contractor, the contract between Thomas and Adkinson was invalid. Appellant also asserts that Burns knowingly authorized and permitted Thomas to provide guard services at the store and, thus, violated R.C. 4749.13(C). Appellant asserts that these factors prevented Burns and Adkinson from terminating the Temporary Service Authorization.

Appellant's contentions in this regard are without merit. There is nothing in R.C. Chapter 4749 that prevents Thomas from being licensed as a security guard by more than one entity. Thus, Thomas could be licensed as a security guard by Burns, his own company and/or any other company. There was no evidence

presented as to whether Burns knew who, other than itself, licensed Thomas to provide security guard services. Thus, Burns cannot be found to have knowingly authorized or permitted Thomas to violate R.C. 4749.13(C). In addition, there is no evidence that Burns authorized or permitted Thomas to provide security guard service at Ken's Cardinal on his own. The evidence demonstrates that Burns simply did not have a policy against its employees performing jobs for companies other than Burns.

In addition, merely because Thomas was not licensed as an independent contractor to provide security guard services does not make the contract between himself and Ken's Cardinal invalid. Adkinson permitted Thomas to continue to work as a security guard in the store even after Adkinson's Fairfield County Sheriff's uniform was confiscated by the Franklin County Sheriff's Department and after he became aware that Thomas did not have authorization or clearance from the Franklin County Sheriff's Department to perform his job. These things were all grounds under which Adkinson could have terminated his contract with Thomas; however, they are not conditions which would have invalidated Burns's and Adkinson's termination of the Temporary Service Agreement.

Appellant next asserts that the contract between Adkinson and Thomas was induced by fraud and, thus, the Temporary Service Agreement could not be discharged by Burns and Adkinson. Appellant asserts that Thomas's deceit and false representations induced Adkinson to hire Thomas as a security guard instead of continuing the contract with Burns.

While it may be true that Thomas deceived Adkinson by his statements, or by his silence on some matters, this does not affect Adkinson's and Burns's actions in mutually agreeing to abandon their contract, and it does not taint Adkinson's and Thomas's subsequent agreement for security guard services. Because of Thomas's actions, Adkinson might have grounds on which to pursue a cause of action against Thomas; however, they do not create a cause of action upon which appellant could bring suit against Burns, nor do they constitute any basis on which to invalidate the actions of Burns and Adkinson with respect to the Temporary Service Agreement.

Based on the foregoing, appellant's first, second, third, fourth and fifth assignments of error are not well taken.

In her sixth assignment of error, appellant asserts that the trial court erred in holding as a matter of law that the exclusion of liability clause contained in the Temporary Service Agreement which required Ken's Cardinal to indemnify Burns from liability was valid and enforceable against appellant.

Inasmuch as this court, in ruling on appellant's first five assignments of error, found that the Temporary Service Agreement between Burns and Ken's Cardinal

was abandoned and was not in effect at the time appellant was injured, appellant's sixth assignment of error is overruled as moot.

In her seventh assignment of error, appellant asserts that the trial court erred in holding as a matter of law that Burns was not liable to appellant under any of the following theories: breach of contract, negligence, negligence *per se* and interference with a contract.

This court has already determined that the trial court correctly decided the breach of contract issue. With respect to the negligence claim, appellant asserts that, because Burns breached the Temporary Service Agreement, it was negligent. Based on this court's ruling that the Temporary Service Agreement was not in effect at the time appellant was injured, there is no cause of action against Burns for negligence.

Appellant next asserts that Burns was negligent *per se* when it violated various provisions of R.C. Chapter 4749.

In *Eisenhuth v. Moneyhon* (1954), 161 Ohio St. 367, 53 O.O. 274, 119 N.E.2d 440, the court held at the syllabus:

"2. Where a legislative enactment imposes upon any person a specific duty for the protection of others, and his neglect to perform that duty proximately results in injury to such another, he is negligent per se or as a matter of law.

"3. Where there exists a legislative enactment commanding or prohibiting for the safety of others the doing of a specific act and there is a violation of such enactment solely by one whose duty it is to obey it, such violation constitutes negligence per se; but where there exists a legislative enactment expressing for the safety of others, in general or abstract terms, a rule of conduct, negligence per se has no application and liability must be determined by the application of the test of due care as exercised by a reasonably prudent person under the circumstances of the case."

In *Westervelt v. Rooker* (1983), 4 Ohio St.3d 146, 4 OBR 390, 447 N.E.2d 1307, the court stated that a claim in negligence *per se* may only be had when a statute sets forth a specific course of conduct designed to protect the safety of others. If the statute does not so provide, then a negligence *per se* claim will not lie.

R.C. Chapter 4749 governs the licensing and regulation of private investigators and security guards. This chapter does not set forth any course of conduct designed to protect the safety of others and, instead, provides general regulations for licensing, registration and investigation of applicants, as well as regulations on who may carry a firearm. Because R.C. Chapter 4749 does not set forth a specific course of conduct designed to protect the safety of others, violations of R.C. Chapter 4749 cannot be the basis of a negligence *per se* claim.

As such, the trial court did not err when it determined that appellant did not have a cause of action against Burns in negligence *per se.*

The last assertion under appellant's seventh assignment of error is that the trial court erred when it rejected her claim for interference with a contract. Appellant asserts that Burns, by utilizing Thomas in his capacity as a Burns supervisor while he was working at Ken's Cardinal, tortiously interfered with the contract between Thomas and Adkinson. While working at Ken's Cardinal, Thomas frequently received messages involving Burns business which he had to address. Appellant asserts that Thomas was receiving a Burns message from Cofer when the robbery and subsequent shooting took place and, because Thomas was engaged in Burns business, he was not in a position to stop the robbery at the store.

■■■ The common-law tort of business interference was recognized in Ohio in *Juhasz v. Quik Shops, Inc.* (1977), 55 Ohio App.2d 51, 57, 9 O.O.3d 216, 219, 379 N.E.2d 235, 238, wherein the court stated:

"The basic principle of such an action is that one who, without a privilege to do so, induces or otherwise purposely causes a third party not to enter into, or continue, a business relationship with another, or perform a contract with another is liable to the other for the harm caused thereby. * * *" See, also, 4 Restatement of the Law 2d, Torts (1979) 20, Section 766B.

In order to conclude that a person is liable for tortious interference with a contract, a finder of fact must find that the person's conduct interfered with the rights of another and, taking into consideration the situation and relationship of the parties, the person's conduct in interfering was improper. See 4 Restatement of the Law 2d, Torts (1979) 26, Section 767.

■■■ This court finds that the intentional act required to impose liability is not present here. Burns did not intentionally interfere with Thomas's duties at Ken's Cardinal, nor did it take any actions to prevent Thomas from working at the store. In addition, even if it could be said that, by Burns having messages brought to Thomas while he worked at Ken's Cardinal, Burns negligently interfered with the contract between Thomas and Adkinson, the elements of tortious interference with a contract are not present. *Developers Three v. Nationwide Ins. Co.* (1990), 64 Ohio App.3d 794, 582 N.E.2d 1130. Further, there is no evidence that Burns interfered with the contract between Thomas and Adkinson simply by having messages brought to Thomas at Ken's Cardinal.

Appellant's seventh assignment of error is not well taken.

Based on the foregoing, appellant's seven assignments of error with regard to Burns are overruled, and the judgment of the trial court as to Burns is affirmed.

Pursuant to R.C. 2505.22, appellee, Burns, raises the following cross-assignments of error:

"1. The trial court erred in ruling that Plaintiff was a third-party beneficiary of the Temporary Service Authorization.

"2. The trial court erred in failing to rule that the alleged inadequacy of the security guard service provided at the Store at the time Plaintiff was shot was not the proximate cause of Plaintiff's injuries."

These cross-assignments of error were raised only if this court were to reverse part or all of the judgment below. Because this court has found all of appellant's assignments of error with regard to Burns to be without merit, this court will not consider or rule on Burns's cross-assignments of error. *Pang v. Minch* (1990), 53 Ohio St.3d 186, 559 N.E.2d 1313. See, also, *Perry v. Providence Twp.* (1991), 63 Ohio App.3d 377, 578 N.E.2d 886.

## THE GUARDIAN ISSUES

As early as 1984, fire and burglar alarms were installed at Ken's Cardinal by Certified, which was also responsible for servicing the alarms. Prior to 1988, the burglar or break-in alarm at the store emitted only an audible signal; however, in 1988, Certified added a hold-up alarm with a panic button which was installed in the office at the front of the store. The hold-up alarm is a silent alarm which sends a signal to a central station monitored by Guardian. When Guardian receives the signal from the hold-up alarm, it notifies the designated law enforcement authorities. Ken's Cardinal entered into an Alarm Monitoring Service Agreement with Guardian to provide the monitoring service on July 15, 1988.

In December 1991, because of an increase in the amount of criminal activity, Ken's Cardinal upgraded the existing hold-up alarm by adding three portable panic buttons. One button was installed at the main cash register, one button was carried by the manager on duty and one button was installed in the rear of the store in the meat department. It was at this same time that Adkinson added the uniformed security guards as well.

On January 31, 1992, shortly before 7:00 p.m., Ken's Cardinal was robbed. Evidence presented by Guardian showed it received the first of two alarm signals at 7:06 p.m., which was several minutes after appellant was shot. Guardian notified the police and received confirmation from the police within sixty seconds of receiving the alarm. Guardian was advised that a shooting had occurred at Ken's Cardinal and that police were already responding to the scene in response to a 911 call. The police arrived within one minute of receiving notification of a problem at Ken's Cardinal.

Appellant filed a complaint against Guardian alleging that her injuries were proximately caused by Guardian's breach of the Alarm Monitoring Service Agreement and by Guardian's negligence. Guardian answered the complaint and filed a motion for summary judgment to which appellant responded. After an oral hearing, the trial court sustained Guardian's motion finding that, even though appellant was an intended third-party beneficiary of the contract[6] between Guardian and Ken's Cardinal, as a matter of law, the limitation of liability provision in the contract was reasonable, valid and enforceable. In addition, the trial court found that appellant did not alter her position in reliance on the contract and, as a result, the limitation of liability provision was valid against appellant. The court also ruled as a matter of law that there was no partnership or joint venture between Guardian and Certified and that Guardian was not liable for the negligence, if any, of Certified in installing the alarms. Judgment to this effect was entered on April 29, 1994, with the additional finding that there was no just reason for delay.

Appellant's first, third and fourth assignments of error are related and will be considered together. In these assignments of error, appellant asserts that the trial court erred in granting summary judgment to Guardian on the issues of negligence and breach of contract.

To establish negligence, appellant must show the existence of a duty, the breach of that duty and injury resulting proximately therefrom. *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 21 O.O.3d 177, 423 N.E.2d 467. In *Menifee v. Ohio Welding Products, Inc.* (1984), 15 Ohio St.3d 75, 15 OBR 179, 472 N.E.2d 707, the court stated that the existence of a duty depends on the foreseeability of the injury. The test for foreseeability is whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance of an act. The foreseeability usually depends on the defendant's knowledge. *Holland v. Riverside Methodist Hosp.* (1990), 70 Ohio App.3d 112, 590 N.E.2d 430.

The contract entered into between Ken's Cardinal and Guardian provides:

"3. The parties agree that the Company's [Guardian] sole obligation under this agreement shall be to monitor signals received from the protective system located on Subscriber's [Ken's Cardinal] premises. The Company, upon receipt of a signal shall make every reasonable effort to transmit notification of the alarm promptly to the police, fire or other authorities and to the person or persons whose names and telephone numbers are provided to the Company by Subscriber, unless there is reason to assume that an emergency condition does not exist.

---

6. This issue is not in dispute.

" * * *

"5. The customer understands that the Company's only obligation is to monitor signals from the customer's electro-protective system and respond to the signals when received. * * *

˚" * * *

"10. The Company can also not be responsible for losses or damages suffered by a customer caused by:

"A. Defects or deficiencies in the electro-protective system owned by the customer.

"B. Delay in response time or failure to respond by any person or authority notified by the Company according to customer's instructions in this contract."

 In this case, whether or not Guardian owes appellant a duty under this contract turns on whether a reasonably prudent person would have anticipated that appellant would be injured as a result of Guardian's alleged negligence. Because Guardian provides monitoring services for the security system at Ken's Cardinal, it is likely that, should Guardian receive a signal that there was an event occurring at the store which triggered the security system, someone in the store, like appellant, could be harmed. Guardian owed appellant a duty to make a reasonable effort to notify the police upon receiving a signal from Ken's Cardinal.

 There is a question of fact in this case as to whether Guardian received and responded to the signals sent from Ken's Cardinal within a reasonable time. Guardian's evidence shows that it received a signal from Ken's Cardinal at 7:06 p.m., and that, within sixty seconds of receiving that signal, it notified the police and the police were dispatched. However, there is also evidence that panic buttons installed at Ken's Cardinal were pushed prior to 7:06 and that Guardian did not respond to those signals. Both Jones and Ferguson indicated that ten to fifteen minutes elapsed from the time that Jones shouted for everyone to get down on the floor to the time when appellant was shot.

Robert Baker, Assistant Manager at Ken's Cardinal, was working the evening of the shooting and had one of the portable panic buttons in his pocket. As soon as he lay on the ground, which was three to seven minutes before the shooting, he began pushing the panic button in order to send a signal to Guardian. In addition, Marty Higgins, the stock boy at Ken's Cardinal, saw the robbery occurring, ran to the panic button located in the meat department and began pushing it in order to send a signal to Guardian. He believed that he pushed the button three to four minutes prior to the gun being discharged. After the shooting, Baker continued to push his panic button and he instructed Higgins to

push the button at the meat department again.[7] Baker then called 911. It was in response to a 911 call, and within one minute of receiving that call, that the police originally came to Ken's Cardinal.[8] In fact, after Guardian notified the police, it was informed that the police were already on their way to the store.

Based on the foregoing, there is a genuine issue of material fact as to whether or not Guardian breached the duty it owed Ken's Cardinal and appellant under the contract by the manner in which it responded, or failed to respond, to the signal or signals it was sent from the store. As a result, the trial court erred in granting summary judgment and appellant's first, third and fourth assignments of error are well taken.

In her second assignment of error, appellant asserts that the trial court erred in holding that the $250 limitation of liability clause in the Alarm Monitoring Service Agreement was reasonable, valid and enforceable.

The Alarm Monitoring Service Agreement provides:

"11. It is also understood that although the Company [Guardian] is being paid to monitor a system designed to reduce certain risks of loss or damage, the Company cannot guarantee that loss or damage will not occur. The Company is not an insurer against loss or damage. All insurance arrangements to cover loss or damage must be made separately by the customer [Ken's Cardinal].

" * * *

"14. It is understood and agreed by the parties hereto that Company is not an insurer and that insurance, if any, covering personal injury and property loss or damage on Subscriber's [Ken's Cardinal] premises shall be obtained by the Subscriber: that the Company is being paid to monitor a system designed to reduce certain risks of loss and that the amounts being charged by the Company are not sufficient to guarantee that no loss will occur; that the Company is not assuming responsibility for any losses which may occur even if due to Company's negligent performance or failure to perform any obligation under this agreement. The Company does not make any representation or warranty, including any implied warranty or merchantability or fitness, that the system installed by the installer [Certified] or service supplied by the Company may not be compromised, or that the services will in all cases provide the protection for which it is intended.

---

7. Both Baker and Higgins stated that, although they were pushing the panic buttons, they had no idea whether or not they were working because the buttons have no way of showing if a signal has been sent.

8. Although the clocks at Ken's Cardinal, Guardian and the police station were not synchronized, the evidence shows that the 911 call came into the police station seven minutes prior to Guardian's notifying the police.

"Since it is impractical and extremely difficult to fix actual damages which may arise due to the failure of services provided, if, notwithstanding the above provisions, there should arise any liability on the part of the Company, such liability shall be limited to an amount equal to one-half the annual service charge provided in any agreement between the installer and the Subscriber or $250, whichever is greater. This sum shall be complete and exclusive and shall be paid and received as liquidated damages and not as a penalty.

"15. Subscriber agrees to and shall indemnify and save harmless the Company, its employees and agents, for and against all third party claims, lawsuits and losses alleged to be caused by Company's performance or failure to perform its obligations under this agreement."

██ In Ohio, clauses in contracts providing for reasonable liquidated damages are recognized as valid and enforceable. *Jones v. Stevens* (1925), 112 Ohio St. 43, 146 N.E. 894. However, reasonable compensation for actual damages is the legitimate objective of the liquidated damages provisions and, where the amount specified is plainly unrealistic and inequitable, courts will ordinarily regard the amount as a penalty. *Sheffield–King Milling Co. v. Domestic Science Baking Co.* (1917), 95 Ohio St. 180, 115 N.E. 1014.

In *Samson Sales, Inc. v. Honeywell, Inc.* (1984), 12 Ohio St.3d 27, 28–29, 12 OBR 23, 24–25, 465 N.E.2d 392, 393–394, the Supreme Court construed a limitation of liability clause in a contract which limited Honeywell's liability to $50. The court stated:

"Whether a particular sum specified in a contract is intended as a penalty or as liquidated damages depends upon the operative facts and circumstances surrounding each particular case, but time has apparently had no undermining influence upon the guiding principles initially set forth in *Jones v. Stevens, supra,* where the court held at paragraph two of the syllabus:

" 'Where the parties have agreed on the amount of damages, ascertained by estimation and adjustment, and have expressed this agreement in clear and unambiguous terms, the amount so fixed should be treated as liquidated damages and not as a penalty, if the damages would be (1) uncertain as to amount and difficult of proof, and if (2) the contract as a whole is not so manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the conclusion that it does not express the true intention of the parties, and if (3) the contract is consistent with the conclusion that it was the intention of the parties that damages in the amount stated should follow the breach thereof.' "

The court, in holding that the clause in the contract constituted a penalty, stated, at 29, 12 OBR at 25, 465 N.E.2d at 394:

" * * * [A]n examination of the minute type used in the standard contract issued * * *, as well as a fair construction of the contract provision as a whole, fails to evince a conscious intention of the parties to consider, estimate, or adjust the damages that might reasonably flow from the negligent breach of the agreement. * * * [T]he nominal amount set forth in the contract * * * has the nature and appearance of a penalty."

Guardian asserts that this court should not apply *Samson,* but instead should follow *Royal Indemn. Co. v. Baker Protective Services, Inc.* (1986), 33 Ohio App.3d 184, 515 N.E.2d 5, which interpreted *Samson.* In *Royal Indemn.,* the court determined that the contract in that case contained broader provisions than the exculpatory clause limiting liability in *Samson.* As a result, the court found that, absent some overwhelming public policy, such as the concept of unconscionability, which was not present in the case, Ohio courts have held that the concept of freedom of contract is fundamental to our society. As such, the parties to a contract should have complete freedom to create whatever relationship they desire. Based on these concepts, the court held "that the *Samson* case does not dictate a result favorable to appellants."

While this court does not disagree that parties to a contract should have the freedom to fashion whatever relationship they desire, such a relationship was not established in this case. The Alarm Monitoring Service Agreement which was signed by Ken's Cardinal was presented to Adkinson by Sephel, sole owner and operator of Certified, at the time Certified installed Ken's Cardinal's security system in July 1988. This was a standardized form which Adkinson signed and which was also signed by Sephel and, later, Guardian. Adkinson never spoke to, or met with, anyone from Guardian concerning the contract and, instead, he signed the contract and gave it back to Sephel, who submitted it to Guardian.

Applying the principles set forth in *Samson* and *Jones* to this case, this court finds that the $250 limitation in the Alarm Monitoring Service Agreement constitutes a penalty and does not constitute liquidated damages. Adkinson and Guardian never established the type of relationship which manifests an intention by the parties to consider, adjust or estimate the damages that might reasonably occur from the negligent breach of the Alarm Monitoring Service Agreement. Further, any damages that might result from a breach of the contract are not so uncertain or difficult to prove as to create an ambiguity as to their amount. Appellant's second assignment of error is well taken.

In her fifth assignment of error, appellant asserts that the trial court erred in holding as a matter of law that Guardian and Certified were not engaged in a joint venture.

 In *Ford v. McCue* (1955), 163 Ohio St. 498, 56 O.O. 410, 127 N.E.2d 209, the court held at paragraph one of the syllabus:

"A joint business adventure is an association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business adventure for joint profit, for which purpose they combine their efforts, property, money, skill and knowledge, without creating a partnership, and agree that there shall be a community of interest among them as to the purpose of the undertaking, and that each coadventurer shall stand in the relation of principal, as well as agent, as to each of the other coadventurers, with an equal right of control of the means employed to carry out the common purpose of the adventure."

The court stated that, whether the parties have created a joint venture, or some other relationship, depends upon their actual intention. In addition, an agreement for a division of the profits between the parties is essential in a joint business venture. Profit is defined as the gain realized from business or investment which is over and above expenditures. *L & H Leasing Co. v. Dutton* (1992), 82 Ohio App.3d 528, 612 N.E.2d 787. In *Bennett v. Sinclair Refining Co.* (1944), 144 Ohio St. 139, 29 O.O. 223, 57 N.E.2d 776, paragraph four of the syllabus, the court held that, where the existence of the relationship of joint venturers is an issue, the question is one of fact for determination by the trier of fact. See, also, *Busler v. D & H Mfg., Inc.* (1992), 81 Ohio App.3d 385, 611 N.E.2d 352.

 In this case, after construing the evidence most strongly in favor of appellant, reasonable minds could reach different conclusions as to whether Guardian and Certified were engaged in a joint venture and, therefore, the trial court erred in ruling as a matter of law that no joint venture existed.

There is evidence that Sephel, at the time he installed the Certified security system, gave Adkinson the Alarm Monitoring Service Agreement to sign so that Guardian could monitor the security system. Three signatures appear on the Alarm Monitoring Service Agreement: Adkinson's; Sephel's, for Certified; and Guardian's. Certified's Alarm System Lease Agreement provides:

"2. LESSEE [Ken's Cardinal] agrees to pay LESSOR [Certified], or its assigns, the sum of *$14.00* as follows:

"A deposit of $*None* upon signing this agreement. $*Prepaid* upon completion of the installation of the SYSTEM and to pay in addition for use, maintenance and *monitoring* of said SYSTEM, the sum of *$14.00* per month in advance. * * *" (Emphasis added.)

In addition, Guardian's Alarm Monitoring Service Agreement provides:

"2. Subscriber [Ken's Cardinal] hereby represents that it has contracted, or is about to contract, with installer [Certified] for the installation of a protective

system at premises owned or occupied by Subscriber and in connection with such installation has also requested monitoring service of said system. Installer and Subscriber have entered into an agreement whereby the *installer will provide monitoring services for the Subscriber* consisting of the following:

"(a) direct call response by experienced operators to an emergency condition until proper authorities are notified;

"(b) direct call response until a station designated by Subscriber is notified;

"(c) *notification to the installer* that an alarm condition has occurred, if requested;

"(d) such other services as may be agreed upon by the parties." (Emphasis added.)

Both of these contracts involve a connection between the installer, Certified, and the monitoring company, Guardian. In addition, Certified also suggested using Guardian to Adkinson and, in fact, had Guardian's price lists for services. Despite these facts, the evidence also shows that Sephel was free to use and suggest any monitoring company that he chose to his customers, although he rarely, if ever, suggested a company other than Guardian.

For those Certified customers who used Guardian as their monitoring company, Guardian would do the billing for both itself and Certified. Part of the bill would include a commission for Sephel, which amount was determined by him. This commission was forwarded to Sephel by Guardian. In addition, Guardian kept a set of books that showed all of Certified's customers and the amounts they paid. Whatever amount paid was above Guardian's charges, plus their billing charge, would be remitted to Sephel.

Although Guardian would take any business that Certified brought to them, Guardian was also a competitor of Certified in that they also sold, installed and maintained security systems. Regardless, because of the relationship between Certified and Guardian, there is a question of fact as to whether the parties were separate, independent entities or whether the parties were engaged in a joint venture. As such, the trial court erred in determining, as a matter of law, that the parties were engaged in a joint venture and appellant's fifth assignment of error is well taken.

Based on the foregoing, appellant's five assignments of error with regard to Guardian are sustained, the judgment of the trial court as to Guardian is reversed and this cause is remanded for further proceedings consistent with this opinion.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

WHITESIDE, P.J., and PETREE, J., concur.