[Cite as *Marks v. Raymond*, 2021-Ohio-3375.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| JOSEPH PATRICK MARKS | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 29065 |
| | : | |
| v. | : | Trial Court Case No. 2018-CV-5119 |
| | : | |
| DEBORAH RAYMOND, et al. | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| Defendants-Appellees | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 24th day of September, 2021.

. . . . . . . . . . .

TODD E. BRYANT, Atty. Reg. No. 0072738, 122 West Main Street, Troy, Ohio 45373
        Attorney for Plaintiff-Appellant

KEVIN A. BOWMAN, Atty. Reg. No. 0068223, 130 West Second Street, Suite 900, Dayton, Ohio 45402
        Attorney for Defendants-Appellees

. . . . . . . . . . . .

WELBAUM, J.

**{¶ 1}** Plaintiff-appellant, Joseph Patrick Marks, appeals from a judgment of the Montgomery County Court of Common Pleas in favor of defendants-appellees, Deborah and Brian Raymond, on Marks' breach-of-contract claim. For the reasons outlined below, the judgment of the trial court will be affirmed.

**Facts and Course of Proceedings**

**{¶ 2}** On November 2, 2018, Marks filed a complaint against his adult daughter, Deborah, and her husband, Brian ("the Raymonds"), alleging breach of contract, unjust enrichment, quantum meruit, conversion, and statutory claims for damages. In response to the complaint, the Raymonds filed an answer denying each of Marks' claims. The Raymonds also filed a counterclaim against Marks alleging breach of contract, fraud, and promissory estoppel. The matter ultimately proceeded to a two-day bench trial on January 5 and 6, 2021.

**{¶ 3}** Prior to trial, Marks withdrew his conversion and statutory damages claims, and the Raymonds withdrew their claim of fraud. The parties also filed several stipulations. The parties stipulated that Marks and the Raymonds had entered into an oral agreement under which Marks had agreed to pay for the construction of an addition onto the Raymonds' home in Tennessee that would accommodate Marks' living there. In exchange for Marks funding the addition to the Raymonds' home, the Raymonds agreed that Marks could live with them after the addition was completed and that Deborah would take care of Marks due to his failing mental and physical health.

**{¶ 4}** The parties also stipulated that Marks and Deborah opened a joint checking account so that Deborah could pay Marks' bills, including the bills for the construction

project. The parties further stipulated that Deborah never spent any funds from the joint account in an unauthorized manner. The parties, however, disagreed on the amount of money that Marks agreed to pay for the construction project. Marks initially claimed that he only agreed to pay for half the cost of the project, whereas the Raymonds claimed that Marks agreed to pay for the entire project.

{¶ 5} The parties additionally stipulated that Marks and Deborah got into a heated argument on August 16, 2018, after Marks wrongly accused Deborah of stealing $35,000 from the joint bank account. There is no dispute that Deborah used the $35,000 to pay the general contractor who was hired to build the addition onto the Raymonds' home. The parties also stipulated that on August 18, 2018, the Raymonds participated in a recorded speakerphone conversation with Marks, one of Marks' other daughters, Kimberly Buckley, and Kimberly's husband, Pete Buckely ("the Buckleys"), in order to discuss Marks' living situation. The parties further stipulated that Marks never moved to Tennessee and that Marks never told the Raymonds to stop construction on their home because he would not be moving to Tennessee.

{¶ 6} At trial, Marks called the Buckleys to testify on his behalf. Marks also called Deborah to testify as if on cross-examination. For the defense, the Raymonds presented testimony from Deborah, the general contractor who built the addition, Billy Mathis, and the realtor who listed and sold Marks' home in Ohio, Sue Piersall. The Raymonds also called Marks to testify as if on cross-examination. The following is a summary of the testimony and evidence presented at trial.

{¶ 7} In March 2017, Marks discovered that one of his daughters, Cheryl, had been improperly taking money out of his bank account while she had been an authorized user.

As a result, Deborah came to Ohio from Tennessee in order to help Marks with his finances after removing Cheryl from his bank account. On March 15, 2017, Marks opened a new joint bank account with Deborah's help and made Deborah an authorized user. From this joint bank account, Deborah paid Marks' bills and managed his funds.

{¶ 8} While Deborah was in Ohio helping Marks, she and the Buckleys discussed Marks' failing mental and physical health. They also discussed the possibility of Marks moving to Tennessee to live with Deborah and her family so that Deborah could care for Marks. Deborah indicated that in order for Marks to move in with her, it would be necessary to build an addition onto her home.

{¶ 9} Following this discussion, and after returning to Tennessee, Deborah started getting quotes from contractors for the cost of building an addition onto her home. After Deborah discussed the matter with Marks, on December 28, 2017, the Raymonds signed a construction contract with Mathis, who had been hired to build the addition. Marks was on the phone with the Raymonds at the time the contract was signed. The contract, which was admitted into evidence, listed the estimated cost of the project as $74,229. *See* Def.'s Ex. B. Marks agreed that the contract price would be paid from his money in the joint bank account that Deborah was authorized to access.

{¶ 10} Prior to the Raymonds' signing the contract, Marks had the opportunity to speak with Mathis on the phone and ask questions about the project. At one point, Marks told Mathis that if the project "is going to cost me 70-something-thousand dollars, * * * I just need to know what I'm getting." Trial Trans., p. 208. At the time the contract was signed, and after his conversation with Marks, Mathis understood that the addition was being built for Marks and that Marks would be paying for the project. Mathis also

understood that Deborah would be handling the day-to-day needs for the project and would be making the periodic payments.

{¶ 11} Once the contract was signed, construction of the addition began in March 2018.   The parties understood that once the addition was completed, Marks would move to Tennessee to live with the Raymonds.   In the meantime, Marks would be in Ohio working with a realtor, Piersall, to sell his home in Huber Heights.   Piersall also helped Marks sell some of his personal property in order to downsize for the move to Tennessee.

{¶ 12} On May 24, 2018, Marks drove from Ohio to Tennessee and stayed with the Raymonds for several days.   During this time, Marks observed the progress on the construction project and spoke with multiple construction workers.   Marks also brought down some of his personal property that he wanted to have with him once he moved in with the Raymonds.   While visiting, Marks expressed no dismay about the construction project.

{¶ 13} On July 23, 2018, Marks made a second trip to Tennessee and brought more of his property with him.   The following day, Marks tripped on a broken floorboard in the Raymonds' kitchen and angrily said "this goddamned place has been a [sic] disarray from the beginning."   Trial Trans., p. 95.   Deborah then told Marks that she could not afford to fix the floor and that she did not "have money falling out of [her] ass like Kimberly."   *Id.*   In response, Marks threw his cup into the sink and angrily stormed out of the kitchen.   Marks immediately drove back to Ohio without saying anything to Deborah and would not answer Deborah's phone calls for several days.

{¶ 14} At the time Marks stormed out of the Raymonds' house, Deborah had paid $37,944.10 from the joint bank account for the construction project, and $5,742.98 from

her own personal account for certain change orders. Approximately $35,000 still had to be paid for the project. Given Marks' behavior, and because Deborah had observed how Marks acted in previous disputes with her sisters Cheryl and Kimberly, Deborah was concerned that Marks would remove her from the joint bank account, meaning that Deborah would have to pay the remaining $35,000 with her own funds, which she did not have. As a result, the day after Marks stormed out of her house, Deborah withdrew $35,000 from the joint bank account and transferred it to her own personal account so that she would be able to make the final payments to Mathis. This was different than other withdrawals she had made from the joint account, as Deborah usually wrote checks directly to Mathis. There is no dispute, however, that Deborah used the $35,000 for the construction project.

{¶ 15} The day after Deborah made the $35,000 transfer, the bank called Marks and alerted him to the large withdrawal. After being alerted of the withdrawal, Marks and his daughter Kimberly went to the bank to see what was going on. While at the bank, a bank employee, who was familiar with Marks' financial history, said "we think we have another Cheryl on our hands." Trial Trans., p. 34. Marks then froze his joint bank account with Deborah so that Deborah could no longer access it. Once the account was frozen, Deborah was alerted to the change and attempted to call the bank to find out what was going on. The bank employees, however, would not tell Deborah anything. Marks also continued to ignore Deborah's phone calls.

{¶ 16} On July 28, 2018, Marks eventually called Deborah and told her that he would be arriving in Tennessee the following day. This was Deborah's first contact with Marks since he stormed out of her house four days earlier. At this point, given Marks'

bank activity, Deborah assumed that Marks knew about the $35,000 transfer.

{¶ 17} On July 29, 2018, Marks arrived at the Raymonds' residence and moved the rest of his belongings into the house. Marks never said anything to Deborah about the frozen account or the $35,000 transfer. Deborah assumed everything was fine since Marks acted as if nothing was wrong and moved in the rest of his belongings.

{¶ 18} On August 1, 2018, Marks drove back to Ohio in order to close on his house. The closing, however, got delayed until August 10, 2018. Marks stayed in Ohio for the closing, but he could not move to Tennessee until the addition was completed on August 17, 2018. As a result, Deborah purchased a hotel room for Marks to stay in until the addition was ready. During this time, Marks would not answer any of Deborah's phone calls.

{¶ 19} On August 16, 2018, the day before Marks was supposed to move to Tennessee, Marks called Deborah and told her that he did not like her taking the $35,000 from his account. Marks also told Deborah that he had only agreed to pay for half of the project, which he had already paid. Deborah, however, had no idea what Marks was talking about, since Marks had previously agreed to pay for the entire project. As their conversation continued, Marks accused Deborah of stealing his money and demanded all of his money back. Marks also told Deborah to start sending his paperwork and bills to Kimberly to handle. Deborah asked Marks where he was going to stay and Marks told her: "I'll be fine. * * * I'll figure it out. I always do." Trial Trans., p. 105. Based on their conversation, Deborah assumed that Marks was no longer moving to Tennessee. Deborah was heartbroken by Marks' theft accusation.

{¶ 20} As suspected, Marks did not move to Tennessee on August 17th as

planned. On August 18, 2018, Marks, the Raymonds, and the Buckleys took part in a recorded speakerphone conversation in order to discuss Marks' living situation. *See* Pl.'s Ex. 1 and 2. During the conversation, the Buckleys tried to explain that the theft accusation was based on a misunderstanding and that Marks still wanted to move in with the Raymonds. Marks, however, never stated that he still wanted to move to Tennessee and was, for the most part, silent during the call.

{¶ 21} The Buckleys also told the Raymonds that Marks wanted to speak with the Raymonds face to face about the issue. The Raymonds, however, declined that idea and said that Marks could speak to them right then and there over the phone. In response to this, Marks said: "Keep the fucking money. Forget it. It's over." Pl.'s Ex. 1. As the conversation continued, Deborah made it clear that Marks' theft accusation had hurt her tremendously and that, because of his actions, Marks was no longer welcome to move into her home.

{¶ 22} At the conclusion of this call, there was an understanding that Marks would not be moving to Tennessee at any point and that he would instead go and retrieve all of his personal property and bring it back to Ohio. The day after the call, Kimberly's husband, Pete, drove Marks to Tennessee and Marks retrieved all of his property. Marks later moved into an assisted living facility in Ohio.

{¶ 23} After trial, the parties submitted post-trial briefs. In Marks' brief, Marks conceded that the balance of the evidence established that he had agreed to pay for the entire cost of the addition. The parties agreed that the total cost of the addition (not including upgrades and other work requested by the Raymonds) came in under budget at $69,644.73. The Raymonds conceded that they were responsible for certain

upgrades they made to their home as a result of the addition, and that because of this, Marks was owed $7,106.12.

{¶ 24} Given that there was no dispute that an oral contract existed between the parties, the trial court only considered the parties' breach of contract claims, because claims for quantum meruit, unjust enrichment, and promissory estoppel do not apply when there is a contract. *See John D. Smith Co., L.P.A. v. Lipsky*, 2d Dist. Greene No. 2019-CA-65, 2020-Ohio-3985, ¶ 54; *Han v. Univ. of Dayton*, 2015-Ohio-346, 28 N.E.3d 547, ¶ 46 (2d Dist.).

{¶ 25} After reviewing the parties' breach of contract claims, the trial court found that neither party had breached the oral contract at issue. In so holding, the trial court found that Marks had not breached the contract because he had paid for the entire cost of the addition as agreed. The trial court also found that Deborah's reciprocal agreement to care for Marks following the construction of the addition never came to fruition because Marks did not move in with the Raymonds as planned. The trial court found that Marks' failure to move in with the Raymonds was not the result of the Raymonds breaching the contract, but was instead the result of the parties mutually abandoning the contract.

{¶ 26} Based on its mutual abandonment finding, the trial court held that neither party could sue for breach of contract or recover damages, except for the $7,106.12 that the Raymonds offered to return to Marks. Therefore, given these findings, the trial court entered a judgment in favor of the Raymonds on Marks' breach-of-contract claim, a judgment in favor of Marks on the Raymonds' breach-of-contract claim, and awarded Marks a total sum of $7,106.12.

{¶ 27} Marks now appeals from the trial court's judgment, raising two assignments

of error for review.

## First Assignment of Error

{¶ 28} Under his first assignment of error, Marks raises three arguments challenging the trial court's finding that the parties mutually abandoned their contract. Marks first argues that the Raymonds waived the defense of mutual abandonment by failing to raise it as an affirmative defense in their answer to Marks' complaint. Marks also argues that the evidence did not establish that he intentionally relinquished his rights under the contract as required for mutual abandonment. Marks lastly argues that even if the parties had mutually abandoned their contract, the trial court still erred because it did not restore the parties to their original position by ordering the Raymonds to return the entire cost of the addition to Marks.

### *Standard of Review*

{¶ 29} "Whether the parties mutually agreed to abandon the contract is a question of fact for the trier of fact to determine." *Fornshell v. Tiller*, 12th Dist. Warren No. CA93-07-051, 1994 WL 12301, *2 (Jan. 18, 1994), citing *Mooney v. Green*, 4 Ohio App.3d 175, 178, 446 N.E.2d 1135 (12th Dist.1982). *Accord Reiter Dairy, Inc. v. Ohio Dept. of Health*, 10th Dist. Franklin No. 01AP-944, 2002-Ohio-2402, ¶ 15. "The standard of review for questions of fact on appeal is whether the record contains sufficient competent, credible evidence going to all the essential elements of the case to support the trial court's judgment." *Golden v. Dept. of Highway Safety*, 10th Dist. Franklin No. 95API12-1616, 1996 WL 325489, *3 (June 11, 1996), citing V*ogel v. Wells*, 57 Ohio St.3d 91, 566 N.E.2d

154 (1991). "In determining whether the record contains the necessary competent, credible evidence, a reviewing court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the finder of fact clearly lost its way." *In re P.A.*, 10th Dist. Franklin No. 17AP-728, 2018-Ohio-2314, ¶ 13, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20. "However, reviewing courts 'must always be mindful of the presumption in favor of the finder of fact.' " *Id.*, quoting *Eastley* at ¶ 21. "[A]n appellate court must not substitute its judgment for that of the trial court where there exists some competent and credible evidence supporting the findings of fact and conclusions of law rendered by the trial court." *Myers v. Garson*, 66 Ohio St.3d 610, 616, 614 N.E.2d 742 (1993).

*Mutual Abandonment*

{¶ 30} " 'Abandonment is the intentional relinquishment of a known right. A contract will be treated as abandoned when the acts of one party inconsistent with the existence of the contract are acquiesced in (accepted) by the other party.' " *Barton v. Patterson*, 2d Dist. Miami No. 79-CA-3, 1979 WL 208605, *3 (Aug. 14, 1979), quoting *Hodges v. Ettinger*, 127 Ohio St. 460, 463, 189 N.E. 113 (1934). Therefore, "[p]arties to a contract may mutually relinquish or abandon their rights under a contract when one party acts inconsistently with the existence of the contract and the other party acquiesces." (Citations omitted.) *Tucker v. Young*, 4th Dist. Highland No. 04CA10, 2006-Ohio-1126, ¶ 24; *Snell v. Salem Ave. Assocs.*, 111 Ohio App.3d 23, 31, 675 N.E.2d 555 (2d Dist.1996). "The contract is then dissolved and the parties are placed in their

original positions, with no potential suit for breach of contract." *Snell* at 31, citing *Hunter v. BPS Guard Servs., Inc.*, 100 Ohio App.3d 532, 541, 654 N.E.2d 405 (10th Dist.1995). " '[M]utual abandonment of a contract need not be express, but can be inferred from the conduct of the parties and the surrounding circumstances.' " *Hunter* at 541, quoting *Dickson v. Wolin*, 9th Dist. Summit No. 2442, 1934 WL 2590 (Nov. 27, 1934).

### *Mutual Abandonment Was Tried by Implied Consent*

{¶ 31} As noted above, Marks initially claims that the Raymonds waived the defense of mutual abandonment because they failed to raise it as an affirmative defense in their answer to Marks' complaint. We disagree.

{¶ 32} Mutual abandonment of a contract is an affirmative defense that is waived if it is not asserted in a responsive pleading. *Buckeye Telesystem, Inc. v. MedCorp., Inc.*, 6th Dist. Lucas No. L-05-1256, 2006-Ohio-3798, ¶ 31. "[A] trial court cannot sua sponte raise an affirmative defense on behalf of a defendant who fails to do so." *O'Brien v. Olmsted Falls*, 8th Dist. Cuyahoga Nos. 89966, 90336, 2008-Ohio-2658, ¶ 14, citing *Thrower v. Olowo*, 8th Dist. Cuyahoga No. 81873, 2003-Ohio-2049. However, "Civ.R. 15(B) allows issues not raised by the pleadings to be tried by the express or implied consent of the parties[.]" *Molique v. Allen*, 2d Dist. Montgomery No. 19897, 2004-Ohio-460, ¶ 12.

{¶ 33} For there to be implied consent to try an unpleaded issue, "it must appear that the parties understood the evidence was aimed at the unpleaded issue.' " *Id.* at ¶ 14, quoting *State ex rel. Evans v. Bainbridge Twp. Trustees*, 5 Ohio St.3d 41, 46, 448 N.E.2d 1159 (1983). " 'Various factors to be considered in determining whether the

parties impliedly consented to litigate an issue include: whether they recognized that an unpleaded issue entered the case; whether the opposing party had a fair opportunity to address the tendered issue or would offer additional evidence if the case were to be retried on a different theory; and whether the witnesses were subjected to extensive cross examination on the issue." *Id.*, quoting *Evans* at 45-46. "[A]n issue may not be tried by implied consent where it results in substantial prejudice to a party." *Id.*

{¶ 34} In this case, the Raymonds did not specifically raise mutual abandonment as an affirmative defense in their responsive pleading, but they did raise the defense of acquiescence. Acquiescence is defined as: "A person's tacit or passive acceptance; implied consent to an act." *Black's Law Dictionary* (11th ed. 2019). As previously discussed, "[p]arties to a contract may mutually relinquish or abandon their rights under a contract when one party acts inconsistently with the existence of the contract and the other party *acquiesces.*" (Emphasis added.) *Tucker,* 4th Dist. Highland No. 04CA10, 2006-Ohio-1126, at ¶ 24; *Snell,* 111 Ohio App.3d at 31, 675 N.E.2d 555. Therefore, by pleading acquiescence, the Raymonds implicitly raised the issue of mutual abandonment, as mutual abandonment involves one party acquiescing to the other party's acts that are inconsistent with the contract.

{¶ 35} The Raymonds also asserted "waiver" as an affirmative defense. " 'Waiver presupposes a full knowledge of an existing right or privilege and something done designedly or knowing to relinquish it.' " *Dayspring of Miami Valley v. Carmean*, 2d Dist. Clark No. 2007-CA-28, 2007-Ohio-7159, ¶ 32, quoting *Russell v. Dayton*, 2d Dist. Montgomery No. 8520, 1984 WL 4896, *3 (May 18, 1984). Thus, waiver "consists of an intention to relinquish [a right or privilege.]" *Id.* at ¶ 34, quoting *Russell* at *3. Similarly,

" '[a]bandonment is the intentional relinquishment of a known right.' " *Barton*, 2d Dist. Miami No. 79-CA-3, 1979 WL 208605, at *3, quoting *Hodges*, 127 Ohio St. at 463, 189 N.E. 113. Therefore, by pleading waiver, the Raymonds raised the issue of whether Marks intentionally relinquished his rights under the contract, which is synonymous with abandoning the contract.

{¶ 36} In addition to asserting acquiescence and waiver as affirmative defenses, the Raymonds argued in support of summary judgment that they "relied on Marks' conduct, and believed that they had an understanding that Marks would not move, and they owed no money to Marks" and claimed that this understanding "appeared mutual * * * until Marks sued at the urging of Kimberly Buckley and counsel." Defendant's Reply to Summary Judgment (Dec. 5, 2019), p. 10. Based on this argument, and based on the Raymonds assertion of acquiescence and waiver as affirmative defenses, we find that the issue of mutual abandonment of the contract was sufficiently raised prior to trial, thereby placing Marks on notice of the mutual abandonment defense. We also find that Marks had a fair opportunity to address the issue of mutual abandonment and, in fact, did so at trial when the parties testified regarding their understandings of how and why their oral agreement went awry. Therefore, given the specific circumstances of this case, we find that the issue of mutual abandonment was tried by implied consent of the parties and that Marks was not prejudiced as a result.

{¶ 37} For the foregoing reasons, Marks' claim that the Raymonds waived mutual abandonment as an affirmative defense lacks merit.

*Competent Credible Evidence Supported Mutual Abandonment Finding*

{¶ 38} Marks next claims that the trial court's mutual abandonment finding was erroneous because the evidence failed to establish that he intentionally relinquished his rights under the contract. We, however, find that there was clear and convincing evidence to the contrary. Among that evidence was Deborah's testimony indicating that, on the day before Marks was supposed to move to Tennessee, Marks accused her of theft and, in so many words, indicated that he was no longer moving into the Raymonds' home.

{¶ 39} The audio-recorded speakerphone conversation that took place two days later also tended to indicate that Marks no longer wanted to move in with the Raymonds. Although the Buckleys told the Raymonds that Marks still wanted to move in, Marks never said that himself during the call, and the Buckleys' statements cannot be imputed to Marks. Significantly, Marks can be heard on the call telling the Raymonds to: "Keep the fucking money. Forget it. It's over." Pl.'s Ex. 1. Also, during his deposition, Marks testified that he knew he was not going to move to Tennessee halfway through the construction project, which was well before the parties' speakerphone conversation took place. *See* Def.'s Ex. A, p. 109-110. There was also no dispute that, the day after the speakerphone conversation, Marks retrieved all of his belongings from Tennessee and returned them to Ohio. Furthermore, at trial, Marks testified that he still did not want to live with the Raymonds.

{¶ 40} The foregoing testimony and evidence established that Marks decided that he did not want to move in with the Raymonds well before the Raymonds retracted their offer to have him live with them. It also established that Marks told the Raymonds to forget the contract and keep the money. Following that conversation, Marks immediately

retrieved his belongings from Tennessee and returned to Ohio. From this conduct, it can be inferred that Marks intended to abandon his rights under the contract. *See Hunter*, 100 Ohio App.3d at 541, 654 N.E.2d 405, quoting *Dickson,* 9th Dist. Summit No. 2442, 1934 WL 2590 (" 'mutual abandonment of a contract need not be express, but can be inferred from the conduct of the parties and the surrounding circumstances' ").

{¶ 41} Marks, however, argues that the fact that he obtained an attorney and had his attorney send the Raymonds a letter demanding his money back shortly after the speakerphone conversation demonstrated that he did not intend to relinquish his rights under the contract. There was, however, evidence in the record establishing that Marks had little to do with retaining counsel, sending the demand letter, and even filing the subsequent lawsuit. During his deposition, Marks testified that he was not the one who sought out the attorney who sent the demand letter. Rather, Marks testified that it was the Buckleys who had "done just about everything." Def.'s Ex. A, p. 82. Moreover, when Marks was asked to identify a copy of his complaint, Marks testified: "I didn't file it. * * * I didn't have actually nothing to do with it." *Id.* at 16. When asked who filed the lawsuit, Marks said: "Kimmy handled that." *Id.* Marks also testified that he had never seen the complaint before and thereafter expressed a complete lack of understanding of what the lawsuit was about. *Id.* at 17 and 119.

{¶ 42} Even assuming the record contained conflicting evidence on the issue of whether Marks intentionally relinquished his rights under the contract, the fact remains that there was competent, credible evidence in the record to support a finding that Marks did, in fact, relinquish his rights. "We, as a reviewing court, may not re-weigh conflicting evidence where some competent, credible evidence exists to support the judgment

below." *Eden v. Smith*, 4th Dist. Pickaway No. 83 CA 16, 1985 WL 6546, *1 (Feb. 26, 1985); *Betlin Manufacturing Co. v. Reco Sporting Goods*, 2d Dist. Clark No. 1898, 1984 WL 5366, *1 (July 9, 1984). For the foregoing reasons, we find no merit to Marks' claim that the evidence failed to establish that he intentionally relinquished his rights under the contract.

*Restoring Parties to Pre-Contract Position is Impossible*

{¶ 43} Marks lastly argues that even if the parties mutually abandoned their contract, the trial court still erred by failing to restore the parties to their pre-contract positions. According to Marks, the trial court should have done this by ordering the Raymonds to pay Marks the entire cost of the addition. In support of this claim, Marks relies on *Areawide Home Buyers, Inc. v. Manser*, 7th Dist. Mahoning No. 04 MA 154, 2005-Ohio-1340, wherein the Seventh District Court of Appeals explained that:

[A] contract may be rescinded based upon an abandonment theory, which entails breach and acceptance of or acquiescence to that breach, giving rise to an inference of mutual consent from the surrounding facts and circumstances. * * *

When rescission is imposed for such reason, the parties should be restored to status quo as much as possible. A purchaser generally should recover the money paid on the purchase price. Specifically, the vendee on a real estate contract should receive his down payment back upon rescission for mutual failure to perform.

(Citations omitted.) *Id.* at ¶ 28 and 30.

{¶ 44} We find it significant that *Areawide* concerned a contract for the purchase of real estate. Given the nature of such a contract, the parties can be restored to their pre-contract positions by simply exchanging money. Because the present case involves a construction contract, and because the construction contemplated by the contract has already been completed, this is not a case wherein the parties can be returned to their pre-contract positions through an exchange of money. This is particularly true here since the Raymonds' home will never be the same as the result of the addition being built and since Marks sold his home as a result of the parties' agreement. Therefore, simply ordering the Raymonds to pay Marks the cost of the addition will not restore the parties to their pre-contract positions, and Marks' claim otherwise lacks merit.

{¶ 45} Most importantly, we find that requiring the Raymonds to pay Marks the cost of the addition would have been unjust given the unique circumstances surrounding the parties' agreement and their post-agreement interactions. The record indicates that Marks knew the Raymonds could not afford to pay for the addition themselves and that he had agreed to pay for the entire addition. The record also indicates that Marks had doubts about the construction project and doubts about living with the Raymonds, but did not communicate any of these doubts to the Raymonds. Rather, Marks allowed the construction project to continue all the way to completion and then demanded his money back because he no longer wanted to move there. Under these circumstances, we do not find that it would have been fair to require the Raymonds to pay for the entire cost of the addition.

{¶ 46} While the addition arguably increased the value of the Raymonds' home, any such value will not be realized unless the Raymonds sell their home, and the trial

court was not in a position to order such a sale. As noted in *Areawide,* "the parties should be restored to status quo *as much as possible*." (Emphasis added.) *Areawide*, 7th Dist. Mahoning No. 04 MA 154, 2005-Ohio-1340, at ¶ 30. Although it was impossible to place either party in their pre-contract position, we find that the trial court's order for the Raymonds to return $7,106.12 to Marks restored the parties to status quo as much as possible.

{¶ 47} For all the foregoing reasons, Marks' first assignment of error is overruled.

## Second Assignment of Error

{¶ 48} Under his second assignment of error, Marks contends that the trial court erred by finding that the Raymonds did not breach the parties' contract. In support of this claim, Marks argues that the Raymonds breached the contract by refusing to allow Marks to move in with them.

{¶ 49} As previously discussed, the abandonment of a contract necessitates at least one party acting inconsistent with the terms of the agreement and the other party acquiescing to the other party's conduct, thus resulting in the contract being dissolved by the mutual assent of both parties. *Hunter*, 100 Ohio App.3d at 541, 654 N.E.2d 405, citing *Hodges*, 127 Ohio St. at 463, 189 N.E. 113. In other words, abandonment "entails breach and acceptance of or acquiescence to that breach, giving rise to an inference of mutual consent from the surrounding facts and circumstances." *Areawide*, 7th Dist. Mahoning No. 04 MA 154, 2005-Ohio-1340, at ¶ 28, citing *Hodges* at 463. Therefore, for purposes of abandonment, one or both of the parties must have breached the contract somewhere along the line.

{¶ 50} In this case, even if the trial court had found that the Raymonds breached the contract by not letting Marks move in with them, the outcome of the case would not have changed because there was competent, credible evidence in the record establishing that Marks acquiesced to any such breach, which ultimately supported the trial court's mutual abandonment finding. This included Marks' deposition testimony and Deborah's trial testimony indicating that Marks decided not to move to Tennessee well before the Raymonds prohibited him from living with them. This also included the recorded speakerphone conversation during which Marks told the Raymonds: "Keep the fucking money. Forget it. It's over." Pl.'s Ex. 1. There was also no dispute that, following the speakerphone conversation, Marks immediately retrieved his belongings from Tennessee and returned to Ohio. From this conduct, it can be inferred that Marks acquiesced in the Raymonds' decision prohibiting him from moving in with them, as the evidence established that Marks did not really want to move in with the Raymonds either. Accordingly, even if the trial court had found that the Raymonds breached the contract, there was competent, credible evidence in the record establishing that Marks acquiesced in that breach, thus relinquishing his rights under the contract as necessary for mutual abandonment.

{¶ 51} For the foregoing reasons, Marks' second assignment of error is overruled.

## Conclusion

{¶ 52} Having overruled both assignments of error raised by Marks, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and EPLEY, J., concur.

Copies sent to:

Todd E. Bryant
Kevin A. Bowman
Hon. Michael W. Krumholtz